**WEHRLE LAW LLC**
J. Christopher Wehrle, Esq.
2601 S. Hanley Rd.
St. Louis, Missouri 63144
Telephone: (314) 272-4113
Fax: (314) 272-4107
Email: chris@wehrlelaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| KEITH DAVIS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BUILD-A-BEAR WORKSHOP, INC., SHARON JOHN, J. CHRISTOPHER HURT, and VOJIN TODOROVIC,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Keith Davis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other

things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Build-A-Bear Workshop, Inc. ("Build-A-Bear" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Build-A-Bear securities between May 28, 2026 and August 26, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Build-A-Bear securities during the Class Period and was economically damaged thereby.

7. Build-A-Bear makes stuffed animals and describes itself as follows:

> Founded in 1997, Build-A-Bear is a leading global retailtainment brand on a mission to add a little more heart to life. At Build-A-Bear, guests are invited to create personalized furry friends through a unique stuffing, dressing, accessorizing and naming process, accentuated by a memorable "heart ceremony" that creates moments of connection for people of all ages.

8. Build-A-Bear is incorporated in Delaware and its principal executive offices are located at 415 South 18th St. St. Louis, Missouri 63103. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "BBW."

9. Defendant Sharon John served as the Company's Chief Executive Officer ("CEO") from the beginning of the Class Period until June 11, 2026.

10. Defendant J. Christopher Hurt has served as CEO since June 11, 2026, and previously served as Chief Operations & Experience Officer from 2015 onwards.

11. Defendant Vojin Todorovic served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

12. Defendants John, Hurt, and Todorovic are collectively referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

14. Build-A-Bear is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16. Build-A-Bear and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

17. Build-A-Bear originally issued its guidance for the 2026 fiscal year on March 12,

2026. On March 12, 2026, the Company projected "total revenues to grow in the mid-single-digits and pre-tax income ranging from a mid-single-digit decline to low single-digit growth, inclusive of a full year of tariff and related costs, as well as longer-range-investments."

18. This guidance was updated on May 28, 2026, the beginning of the Class Period. While Defendants revised Build-A-Bear's 2026 guidance downward, guidance on various metrics remained materially higher than Build-A-Bear could have reasonably achieved as a result of issues specified below.

19. On May 28, 2026, the Company issued a press release announcing its first quarter results and revised guidance, which it noted including "decreasing revenue," and a specific total revenue range of $530 million to $550 million.

20. On May 28, 2026, the Company held its Q1 2026 Earnings Call (the "Q1 Call"). Defendant Hurt made the following statement on the Q1 Call:

> I also want to briefly touch base on wholesale, part of our third pillar of growth. The goal for wholesale is twofold: to, of course, increase revenue, but also to extend our brand presence to tens of thousands of new points of sale. Importantly, we view wholesale as complementary to our workshops with the intention of ultimately serving as a mechanism for awareness and trial, which should also increase brand affinity and drive traffic back to our stores for the full Build-A-Bear experience.
>
> In the first quarter, we expanded the team for this important strategy and opened a new Build-A-Bear showroom in Los Angeles to help serve our wholesale account base. ***This is partially based on the confidence from the recent launch into 1,500 Walmart locations featuring our popular Mini Beans collection. I look forward to updating you as we continue to execute on these strategic pillars.***

21. The Q1 Call included the following exchange:

> **Analyst:** ***Moving to Walmart***. You ramped that up in Q4, came out in Q1. What are kind of the initial learnings from it? And why do you see it going kind of the rest of the year and longer term?
>
> **Defendant Hurt:** Yes Thanks, Eric. And as we stated, we've had a relationship with Walmart in various forms over the past years. This was an actual trend pod placement as a -- in 1,500 locations to test the viability of some of our products and new collections such

> as our Micro Mini Beans, also to be on trend, as we discussed with Blind Bags and also different packs of these Mini Bean collections. So this is one of those areas where we're looking to expand our wholesale business. We're using this as an example of that. As I talked about, we also opened up a Los Angeles showroom to be able to have other accounts, to be able to view our new wholesale lines and grow this business. ***And we've added to our team to do that. As you know, there's a long cycle on the wholesale business. So we're putting plans in place to grow this pillar of our strategy.***

22. The statements in ¶¶ 20-21 were materially false and misleading at the time they were made because Defendant Hurt materially overstated the strength of Build-A-Bear's relationship with Walmart.

23. Defendant Hurt further stated the following regarding the updated outlook:

> While the first quarter results were an important factor, they were not the only factor that we contemplated when looking at our revenue expectations for the remainder of the year. And while we've ultimately chosen to reduce our full year revenue guidance, ***we remain confident in certain initiatives that are slated for the back half, even as we are taking a more cautious view of the economic and geopolitical environment, traffic trends and inflationary pressures.***
>
> ***Importantly, this update reflects a disciplined approach to aligning our outlook with current visibility and does not change our strategy or our confidence in the long-term opportunity.***

24. The statement in ¶ 23 was materially false and misleading at the time it was made because, even accounting for challenges that caused the Company to reduce its guidance, Defendants did not lower the guidance to an accurate range. Further, Defendant Hurt overstated the Company's prospects considering that the relationship with Walmart would not be renewed.

25. Defendant Todorovic made the following statement on the Q1 Call:

> Even with our updated guidance, we expect 2026 to be one of the strongest years in Build-A-Bear's history with the potential to deliver another year of record revenues, maintain solid pretax income margins and continue returning capital to shareholders.

26. The statement in ¶ 25 was materially false and misleading at the time it was made due to the reasons specified in ¶ 24.

27. The statements contained in ¶¶ 20, 21, 23, 25 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Build-A-Bear's guidance remained materially overstated even after Defendants' cut Build-A-Bear's 2026 yearly guidance once; (2) Defendants materially overstated Build-A-Bear's prospects by overstating the strength of Build-A-Bear's relationship with Walmart Inc.; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

28. Serving as further indicia of scienter, on August 24, 2026, just three days before the truth began to emerge, Defendant John, pursuant to a 10b5-1 trading plan put in place earlier in 2026, sold 91,036 shares of Build-A-Bear stock (acquired in 2021 and 2025) for $3,540,930, thus avoiding substantial losses.

## **THE TRUTH BEGINS TO EMERGE**

29. On August 27, 2026, before the market opened, Build-A-Bear reported its Q2 2026 results in a press release. In this press release, Build-A-Bear reported the following financial results (quoted from original), including the below financial results compared to the 13 weeks ended August 2, 2025:

- Second-quarter total revenues were $115.3 million, compared to $124.2 million
- Second-quarter pre-tax income was $11.6 million, compared to $15.3 million
- Second-quarter diluted earnings per share ("EPS") totaled $0.70, compared to $0.94

* * *

- ***The Company updates its fiscal 2026 expectations, including lowering its revenue outlook to a range of $500 million to $525 million and its pre-tax income outlook to a range of $60 million to $68 million***

30. The press release further revealed that consolidated e-commerce demand had decreased 15.6% as compared to the 13 weeks ended August 2, 2025.

31. The Press release quoted Defendant Hurt as stating the following:

> ***While we expected fiscal 2026 to be back-half weighted, second-quarter results fell short of our expectations, and certain wholesale opportunities may take longer to realize than previously anticipated***. Accordingly, we have moderated our outlook for the balance of the year. That said, we continue to execute against our long-term strategic growth initiatives, including the planned acceleration in experience location openings during the remainder of the year. We also look forward to the upcoming grand opening of our new, highly immersive, multi-level, largest retail-tainment destination at ICON Park in Orlando, which will showcase an elevated expression of the Build-A-Bear experience[.]

32. On the same day, Build-A-Bear filed a current report on Form 8-K with the SEC. The press release noted the following executive termination, supporting the inference that Defendants acted with scienter throughout the Class Period:

> ***On August 26, 2026, [Build-A-Bear] terminated the employment of David Henderson, Chief Growth Officer***, without cause, effective as August 26, 2026 (the "Termination Date"). Accordingly, the Amended and Restated Employment, Confidentiality and Noncompete Agreement, effective as of June 11, 2026, by and between Mr. Henderson and the Company, was terminated as of the same date.

33. On the same day, The Wall Street Journal published an article entitled "Build-A-Bear Cuts Revenue View, Fires Exec After Summer Line Flop." The article stated the following:

> [Build-A-Bear] said its summer line didn't resonate with customers and it isn't renewing a major partnership with Walmart.
>
> The retailer cut its outlook for the second time this year and fired its chief growth officer after logging disappointing revenue and traffic in the second quarter. The lower guidance reflects the end of a multimillion-dollar partnership with Walmart, as well as a tepid response to the company's experimental summer-themed products.

* * *

***The new guidance takes into account the end of Build-A-Bear's short-lived wholesale partnership with Walmart***. Starting in March of this year, Build-A-Bear products were placed in more than 1,500 Walmart stores.

***However, Hurt said Thursday that the company was unable to renew the multimillion-dollar deal, and other wholesale opportunities are progressing more slowly than anticipated.***

Also on Thursday, the company said it terminated Chief Growth Officer David Henderson without cause, effective Wednesday. He was in charge of growth, expansion and sales diversification.

34. On the same day, the Company held its Q2 2026 Earnings Call (the "Q2 Call"). Defendant Todorovic revealed the following regarding the guidance cut outlined above:

We have lowered our revenue guidance to a range of $500 million to $525 million, down from our previous range of $530 million to $550 million. ***This reflects second quarter results below our expectations, continuing traffic uncertainty, and no longer expecting to anniversary our multimillion-dollar Walmart order from last year***. For the second half, we expect third quarter performance to improve sequentially, supported by a more favorable year-over-year comparison.

35. The Q2 Call included the following exchange between an analyst and Defendant Hurt, demonstrating how surprised an analyst was by the Company's poor performance with partners leading to a guidance cut:

**Analyst**: Maybe we'll start on the Commercial side. ***So you lost four partners.*** Maybe talk a little bit about what happened there and what's behind the updated guide, assuming no commercial growth in '26?

**Defendant Hurt:** Yes, thanks, Chris, and good morning. From our Commercial segment, we had guided to a plus 20% for the full year. ***With the reduction of the Walmart multimillion-dollar that we now don't anticipate that, that will happen in the back half of the year, that was a reduction in that guidance***. We do anticipate to still be close to our original guidance with our Commercial segment with our international partners and our domestic partners. There is certainly a repositioning of some of those store locations, and we still have our guidance to open at least 50 net new locations this year.

**Analyst:** ***Got you. And with respect to Walmart, I mean, it sounded like things were going pretty well there. Any other details you can provide on that front?***

> Defendant Hurt: Yes, as we talked about, from the Walmart last year, that was an opportunistic opportunity for us with a direct program going into those locations. ***This year, we were unable to anniversary that particular program, and there has been some slowness in anticipation of other wholesale opportunities within the back half.*** We are continuing to work on those wholesale systems to be able to provide replenishment and to be able to work into those as we move forward.
>
> We still see this as an important opportunity and growth strategy for Build-A-Bear. As we talked about with that Walmart last year, we did see a strong sell-through with the Build-A-Bear branded licensed products, and we believe that is the opportunity for us in the future to be able to take advantage of these opportunistic wholesale opportunities.

36. On this news, Build-A-Bear stock fell $10.66 per share, or 27.26%, to close at $28.44 on August 27, 2026.

37. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Build-A-Bear securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

40. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

45. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

51. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

52. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

53. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

54. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

55. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

57. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

59. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

60. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

61. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2026

/s/ J. Christopher Wehrle
J. Christopher Wehrle, #45592MO
**WEHRLE LAW LLC**
2601 S. Hanley Rd.
St. Louis, Missouri 63144
(314) 272-4113
(314) 272-4107 Facsimile
chris@wehrlelaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*